**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Martha Magali Gomez Alvarado, *et al.*, : | | |
| | : | CASE NO:  3:18-cv-00589 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Judge Jack Zouhary |
| Jason Beard, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

### DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

---

Pursuant to Fed. R. Civ. P. 56 and the Court's June 13, 2019 Order (Doc. 43), Defendants Jason Beard and Nathan Kaufmann respectfully move the Court for Summary Judgement.  For the reasons stated in the accompanying Memorandum in Support, the undisputed facts demonstrate that Defendants Beard and Kaufmann are entitled to judgement as a matter of law under the doctrine of qualified immunity. Accordingly, Defendants ask that the Court to enter judgment in their favor on all counts.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ *Scott Myers*
SCOTT MYERS (0040686)
DANIEL J. MARTIN (0065249)
Assistant Attorneys General
Environmental Enforcement Section
2045 Morse Road, A-3
Columbus, Ohio 43229-6693
Phone: 614-265-7071
Fax: 614-268-8871
scott.myers@ohioattorneygeneral.gov
daniel.martin@ohioattorneygeneral.gov
*Counsel for Defendants Jason Beard and Nathan Kaufmann*

1

# TABLE OF CONTENTS

Page(s)

Table of Authorities ............................................................................................ iii

Summary of Issue Presented ................................................................................. v

Memorandum in Support ...................................................................................... 2

I.      Introduction ............................................................................................. 2

II.     Statement of Facts .................................................................................... 2

III.    Law and Argument .................................................................................... 6

       A.      A plaintiff trying to overcome a qualified immunity defense
       faces a heavy burden ........................................................................ 6

       B.      Officers Beard and Kaufmann are entitled to qualified immunity
       on Plaintiffs' Fourth Amendment detention ..................................... 7

              1.   An officer is constitutionally permitted to inquire about
              immigration status during the course of an otherwise lawful stop.......... 8

              2.   Case law supports Officer Beard's decision to involved
              Border Patrol .................................................................. 9

              3.   *U.S. v. Urrieta* is inapplicable ............................................. 12

              4.   Officer Kaufmann is also entitled to qualified immunity ...................... 13

       C.      Plaintiffs had no protected right of privacy in the items retrieved
       from the vehicle and there was no search of the vehicle............................ 13

       D.      Officer Beard is entitled to qualified immunity on Plaintiff's
       Equal Protection Claim ..................................................................... 16

IV.     CONCLUSION ...................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States,*
    567 U.S. 387 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ..................................................... 9, 10

*Bowman v. City of Olmsted Falls,*
    756 Fed. Appx. 526 (6th Cit. 2018) ................................................................................ 17

*Bryant v. Commonwealth of Kentucky,*
    490 F.2d 1273 (6th Cir. 1974)......................................................................................... 19

*Ercegovich v. Goodyear Tire & Rubber Co.,*
    154 F.3d 344 (6th Cir. 1998)........................................................................................... 17

*Farm Labor Org. Comm. v. Ohio State Highway Patrol,*
    308 F.3d 523 (6th Cir. 2002)........................................................................................... 18

*Farm Labor Org. Comm. v. Ohio State Highway Patrol,*
    991 F.Supp 895 (N.D. Ohio 1997)................................................................................ 8, 9

*Farm Labor Org. Comm. v. United States Border Patrol,*
    162 F.Supp.3d 623. (N. Dist. Ohio 2016) ...................................................................... 10

*Florida v. Bostic,*
    501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 165 ......................................................... 7, 8

*Gardenhire v. Schubert,*
    205 F.3d 303 (6th Cir. 2000)..................................................................................... 16, 17

*Griffin v. City of Heath,*
    2006 U.S. Dist. Lexis 23468 (N.D. Ohio 2006)............................................................ 18

*In United States v. Place,*
    462 U.S. 696, 77 L.Ed.2d 110, 103 S.Ct. 2637 (1983) ................................................. 14

*INS v. Delgado,*
    466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) ................................................ 7

*Katz v. United States,*
    389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967) .................................................... 15

*Malley v. Briggs,*
    475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) ................................................. 6

ii

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) ....................................... 19

*McCleskey v. Kemp,*
    481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed. 2d 262 (1987) .......................................... 18

*Muehler v. Mena,*
    544 U.S. 93, 161 L.Ed. 2d 299, 125 S.Ct. 1465 (2005) ......................................... 8, 9

*Reichle v. Howards,*
    566 U.S. 658, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) ......................................... 6

*Saucier v. Katz,*
    533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2009) ......................................... 6

*Schroeder v. Maumee Bd. Of Ed.*
    296 F.Supp 869 (N.D. Ohio 2003) ........................................................................... 18

*Stemler v. City of Florence,*
    126 F.3d 856 (6th Cir. 1997) ............................................................................ 16, 17

*U.S. v. Llanez-Garcia,*
    2011 U.S. Dist. Lexis 89165 (N.D. Ohio 2011) ....................................................... 11

*United States v. Armstrong,*
    517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) ........................................ 17

*United States v. Avery*
    137 F.3d 343 (6th Cir 1997) ................................................................................... 18

*United States v. Ellison,*
    462 F.3d 557(6th Cir. 2006) .................................................................................... 15

*United States v. Salinas-Calderon,*
    728 F.2d 1298 (10th Cir 1984) ................................................................................ 19

*United States v. Urrieta*
    520 F.3d 569 (6th Cit. 2008) ................................................................................... 12

*United States v. Williamson,*
    U.S. Dist. 2011 ......................................................................................................... 8

*Valdez v. United States,*
    58 F.Supp3d 795 (U.S. Dist. Oh 2014) ................................................................... 19

*Van Hull v. Marriott Courtyard,*
    87 F. Supp. 2d 771 (N.D. Ohio 2000) ..................................................................... 19

iii

**Statutes**

8 U.S.C.S. § 1373(a) ................................................................................ 12

8 U. S. C. § 1357(g)(10)(A) ...................................................................... 10

42 U.S.C. § 1983 ...................................................................................... 12

R.C. 1533.32 .............................................................................................. 3

**Other Authorities**

Fourth Amendment .................................................... 7, 8, 14, 15, 16

Fourteenth Amendment............................................................................ 17

## SUMMARY OF ISSUE PRESENTED

- **Did Officer Beard violate a clearly establish constitutional right of Plaintiffs by requesting the assistance of Border Patrol to identify Plaintiffs when Plaintiffs had failed to produce identification or presented suspicious identification.**

- **Did Officers Beard and Kaufmann violate a clearly establish constitutional right of Plaintiffs when they cooperated with Border Patrol and complied with Border Patrol's request to hold Plaintiffs until Border Patrol Agents arrived.**

- **Did Officers Kaufmann and Beard selectively enforce Ohio Revised Code 1533.32 when Plaintiffs offer no proof that there were others similarly situated who were not prosecuted.**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Martha Magali Gomez Alvarado, *et al.*,     :

                       :     CASE NO: 3:18-cv-00589

          Plaintiffs,     :

                       :

     v.                   :

                       :     Judge Jack Zouhary

Jason Beard, *et al.*,           :

          Defendant.     :


## CERTIFICATION PURSUANT TO LOCAL RULE 7.1 (f)


Pursuant to Local Rule 7.1 (f) the undersigned, as Counsel for Defendants Jason Beard and Nathan Kaufmann, hereby certifies that this is a General Civil Case on the Standard Track and that the Defendant's Motion for Summary Judgement complies with the Court's June 13, 2019 (Doc. 43) Order and in all other respects complies with Local Rule 7.1(f).


*Scott Myers /s/*                                July 24, 2019

_____          _____

SCOTT MYERS (0040686)          DATE

vi

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

Though Plaintiffs' Complaint is replete with allegations about U.S. immigration policy, Border Patrol conduct, and the Plaintiffs' separate and unrelated immigration proceedings, the Court need not delve into these complex and controversial matters to resolve this dispute.  This case is not about broad immigration policies.  The U.S. Border Patrol is not even a party to this dispute.  And nothing that happens in this case will affect (or be affected by) Plaintiffs' ability to remain in this country.  Instead, this case boils down to a far narrower and more easily answered question:  was it "plainly incompetent" for a state natural resource officer to call Border Patrol for help—and to follow Border Patrol's instruction to wait for that help to arrive—when that officer encountered Plaintiffs, who admitted to a violation of Ohio law, could not produce a valid identification, and voluntarily admitted to being in the United States unlawfully?   Both case law and common sense show the answer is no.  Plaintiffs fail as a matter of law to show that either officer sued violated any constitutional right, much less a right sufficiently established to overcome qualified immunity.   Both officers are entitled to judgment as a matter of law.

### II.    STATEMENT OF FACTS

The material facts in this case, even viewed in the light most favorable to Plaintiffs, confirm that Officers Beard and Kaufmann are entitled to qualified immunity.  Consistent with this Court's instructions, Defendants will not repeat the entire factual background here, but will simply highlight the key facts entitling Defendants to judgment as a matter of law.

On October 8, 2017, Officer Jason Beard, a natural resource officer for ODNR, was conducting a routine patrol of the Willard Reservoir area when he saw three groups of people fishing in the reservoir.  Beard Deposition pg. 69-70, 72-73, 77, Beard Depo Exh. 2.  One group

2

appeared to be Caucasian, one group was too far away for Officer Beard to determine race, and one group, Plaintiffs, are Hispanic. Beard Depo pg. 69-70, Beard Declaration ("Beard Dec.") ¶ 5. Plaintiffs concede that white couple was fishing further from the top of the path leading to the reservoir. Guadalupe Alvarado ("Guadalupe Depo") pg. 30.

As was his general practice, Officer Beard parked his car, exited his vehicle, climbed the stairs from the parking lot to the reservoir area, and surveyed the water for boating activity. Beard Depo. Pg. 70, Beard Dec. ¶ 6. Seeing none, he directed his attention to checking for fishing violations and to conducting a general well-check. Beard Depo. ¶ 81, Beard Dec. 3. He reached the top of the stairs, turned right, and approached the first group of people he encountered, Plaintiffs. Beard Depo. Pg. 77, Beard Dec. ¶ 6. The time was approximately 1:10 PM. Invest. Case Report at pg. 4 of 5, Attached to Plaintiffs' Complaint, Beard Depo Exh. 5. Guadalupe was fishing in the reservoir; Martha had a line in the water giving the appearance that she was fishing, Comp. ¶ 45-47, 97, and Aracel was sitting with Guadalupe and Martha with a plastic shopping bag within reach. Aracel Deposition ("Aracel Depo.") pg. 44, Beard Depo. Pg. 77, 85. His investigation revealed additional fishing tackle, including fishing line and a hook, remaining in the bag. Aracel Depo. P. 32-33 Aracel Depo. Exh. D, Kaufmann Dec. ¶ 7.

Officer Beard made small-talk with the group, asked them about the fishing that day, and asked them whether they were fishing with a license—all part of his standard protocol. Beard Depo. Pg. 79. Plaintiffs admitted to Officer Beard that none of them possessed a fishing license as required by R.C. 1533.32. Comp. ¶ 52, Beard Depo. Pg. 79. Officer Beard then asked them to present identification—again, his standard practice. Beard Depo. Pg. 85, 89. None of the Plaintiffs could produce a valid government-issued identification. Beard Depo. Pg. 96-99, Comp. ¶ 72.

3

Guadalupe responded by producing a "Universal Net IDCard," a form of identification that Officer Beard had been trained to recognize as a potentially fraudulent identification often used by individuals who are in the country illegally. Beard Depo. Pg. 101. The Net ID expressly states that it is not to be used for official identification purposes. Kaufmann Declaration ("Kaufmann Dec.") ¶ 12, Guadalupe Depo Exhibit F. The absence of any valid identification, combined with the use of the Net ID, raised suspicions for Officer Beard and prompted him to ask the Plaintiffs whether they were in the country lawfully. Beard Depo. Pg. 101. Plaintiffs voluntarily admitted that they were in the country unlawfully. Beard Depo. Pg. 101, Guadalupe Depo. Pg. 36.

Faced with an admitted fishing violation, and unable to confirm the identity of any of the Plaintiffs, Officer Beard made two calls. First he contacted Officer Kaufmann, a wildlife officer for ODNR, for help evaluating and issuing a citation for the violation. Beard Depo. Pg. 102-103, 112, Beard Dec. ¶ 13. Then, he contacted the U.S. Border Patrol, as he had done in the past, for assistance confirming the identity of the Plaintiffs. Beard Depo. Pg. 48, 103, 112. Border Patrol advised Officer Beard that it would be sending agents to the scene and instructed him to wait with the Plaintiffs there until Border Patrol arrived. Beard Depo. Pg. 125, 127, Beard Dec. ¶ 15. Officer Beard made the calls to Officer Kaufmann and Border Patrol approximately ten minutes after first encountering Plaintiffs.

Officer Kaufmann arrived at the scene at approximately 1:40 pm. Investigatory Case Report (Officer Narrative) attached to Plaintiffs' Complaint, Kaufmann Depo. Exh. 7. Officer Beard debriefed Officer Kaufmann and Officer Kaufmann began the process of identifying the individuals. Beard Depo. Pg. 129.

Generally, when multiple people are fishing together, it is Officer Kaufmann's practice to issue a single citation to one member of the group in order to keep the costs to any one family or group from being too high.   Kaufmann Depo. Pg. 118-119.   This is true even when probable cause supports issuing more than one citation.   Kaufmann Dec. ¶ 12.   In this case, Officer Kaufmann determined he would issue a citation to Guadalupe only.   Kaufmann Depo. Pg. 116, Kaufmann Dec. 10.

It generally takes Officer Kaufmann between ten and fifteen minutes to complete a citation once he has all of the necessary information. Kaufmann Depo. Pg 82., Kaufmann Dec ¶ 14. But it takes longer to investigate the offense and gather the necessary information.   The total amount of time varies based on the facts of each case. Confirming identity is part of this process. Absent an accurate identification, a citation, which leads to a summons, could be issued to the wrong individual or address, creating a risk of contempt, court fines, and other consequences. Kaufmann Dec. ¶11. This is especially true if the person to be cited for a fish or game offense cannot confirm Ohio residency, and is potentially outside the jurisdiction of Ohio courts, and where, as is the case here, the identification the officer eventually received appears invalid or indicates out of state residency.

Once Officer Kaufmann arrived on the scene, Officer Beard offered to walk with Martha to the Plaintiffs' vehicle to retrieve a bottle for Aracel's infant child, who had become hungry. Beard Depo. Pg. 130-137.  Plaintiffs' admit that either Aracel or Martha had requested the bottle. Comp. ¶ 73.   Aracel testified she or possibly Guadalupe had the car keys but she cannot remember for sure. Aracel Depo. p. 19, lines 10-15.  She also testified that Martha's statement about Aracel giving the car keys to Martha would be the truth. Aracel Depo. p. 35, p. 36,.  When Martha and Officer Beard reached the car, Officer Beard asked if he could have the keys, to

which Martha responded "yes," and she gave him the keys.  Martha Depo pg. 39.  The bottle was in plain view from the outside of the vehicle.  Officer Beard retrieved the bottle for Martha and handed it to her.  He also retrieved Aracel's purse containing her passport, which was similarly in plain view.  Beard Depo. Pg. 130-137.  He immediately returned the keys to Martha.  Beard Depo. pg. 136.

Border Patrol agents arrived on the scene at approximately 2:45 p.m.  Comp. ¶ 91 They instructed Officer Kaufmann that the information contained on the Net IDCard was appropriate to use to issue the fishing-without-a-license violation.  Kaufmann Dec. ¶ 16.  The ODNR Officers had no further role in handling the scene or interacting with Plaintiffs after Officer Kauffman issued the citation.

## III.   LAW AND ARGUMENT

### A.   A plaintiff trying to overcome a qualified immunity defense faces a heavy burden

Where, as here, defendants raise a qualified immunity defense, a plaintiff bears the burden of proving (1) that the defendant has violated a constitutional right, and (2) that the violated right is so clearly established that a reasonable person in the government official's position would have known his conduct was unlawful.  *Saucier v. Katz*, 533 U.S. 194, 200-201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2009).  The burden is a heavy one:  "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).  Qualified immunity shields from suit all but the plainly incompetent or those who knowingly violate the law.  *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

6

**B.      Officers Beard and Kaufmann are entitled to qualified immunity on Plaintiffs' Fourth Amendment detention**

The Officers' investigation and brief detention of Plaintiffs comports fully with the Fourth Amendment.   Plaintiffs have not shown and cannot show that either officer violated any clearly established right.    Plaintiffs do not dispute that Officer Beard acted lawfully when he stopped and approached Plaintiffs during the course of his routine patrol.   Nor do they take issue with his questioning of Plaintiffs to determine whether they had a fishing violation.   For good reason:  it is well established that the Fourth Amendment permits such limited interactions. Plaintiffs similarly do not and could not contest that Officer Beard was justified in asking the Plaintiffs for their identification after they admitted they did not possess a fishing license. Again, the law on this is clear.    Routine questions regarding identification and obtaining identification do not constitute a seizure. *Florida v. Bostic*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 165, *INS v. Delgado*, 466 U.S. 210, 216, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984).

So what then, do Plaintiffs say constitutes the Fourth Amendment violation?  They contend that the indisputably lawful encounter became constitutionally impermissible when Officer Beard asked Plaintiffs whether they were in the country legally, contacted Border Patrol for assistance, and waited for Border Patrol to arrive at the scene.  But their Complaint does not withstand scrutiny.  To survive qualified immunity, Plaintiffs must be able to point to Sixth Circuit or Supreme Court case law that demonstrates that the particular challenged decisions were so plainly contrary to established case law that the officers' decision can be deemed incompetent or intentional.  Plaintiffs do not satisfy this heavy burden. Plaintiffs can cite no case, much less a binding Sixth Circuit or Supreme Court case, that demonstrates that Officer Beard's decisions violated any right.   And the case law that does exist confirms that Officer Beard's

decisions to ask about Plaintiffs' status and involve Border Patrol were reasonable and fully constitutional.

### 1. An officer is constitutionally permitted to inquire about immigration status during the course of an otherwise lawful stop

In *Muehler v. Mena*, 544 U.S. 93, 100, 161 L.Ed. 2d 299, 125 S.Ct. 1465 (2005), the Supreme Court laid to rest any issues surrounding an officer's ability to ask questions concerning immigration status. *Muehler* involved the execution of a search warrant by local police seeking weapons and gang related evidence. Police were accompanied by an ICE agent. While the search was being carried out, the ICE officer detained and questioned the home's occupants regarding their immigration status. The Supreme Court held that the initial detention was lawful, and the questioning did not prolong the detention. Thus, no additional Fourth Amendment justification was required. The Court reasoned that mere questioning does not constitute a seizure the and therefore the ICE officer' questions were appropriate even if, unlike this case, he lacked reasonable suspicion. *Accord United States v. Williamson*, U.S. Dist. 2011 Lexis at *11.

This Court has held that questions concerning alienage are appropriate if related to the underlying stop or "other circumstances that come lawfully to the officer's attention during the stop." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 991 F.Supp 895, 902-903 (N.D. Ohio 1997). "Mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed. 2d 389 (1991).

Officer Beard did not question Plaintiffs about their immigration status until after Plaintiffs were unable to produce any valid government-issued identification. Even then, what was produced was, something that Officer Beard had been trained to recognize as suspicious. Officer Beard's conduct went beyond that required by *Muehler* because he had a reasonable

8

suspicion that Plaintiffs might be in the country illegally.  When he did question Plaintiffs, they freely admitted that they were in the country illegally.  Therefore, under *Muehler* and *Farm Labor*, Officer Beard's questions were lawful.  Officer Beard is entitled to qualified immunity because Plaintiffs possess no clearly established right that would prohibit Officer Beard from questioning Plaintiffs as to their immigration status, nor can Officer Beard's action be deemed "clearly wrong" in light of *Muehler*.

### 2.    Case law supports Officer Beard's decision to involve Border Patrol

Officer Beard's decisions to contact Border Patrol and to follow Border Patrol's instructions to wait with Plaintiffs until they arrived similarly did not convert the stop into an unconstitutional detention. Officer Beard already had a clear, admitted violation of Ohio law from at least Guadalupe, who had indisputably been fishing without a license.  And he had, at a minimum, reasonable suspicion of a potential violation of Ohio law for both Martha and Aracel. Plaintiffs' inability to produce a valid form of identification prevented him from gathering and confirming the information necessary to issue a citation.  And all adult Plaintiffs admitted they were in the country unlawfully.  Officer Beard's decision to consult Border Patrol for help confirming the Plaintiffs' identity was reasonable and constitutional.  And when he contacted Border Patrol, they told him they could provide the help he needed and instructed him to wait. Plaintiffs can cite no case suggesting that it was unlawful for Officer Beard to communicate and cooperate with Border Patrol on these facts.  To the contrary, the United States Supreme Court has reaffirmed just the opposite is true.

In *Arizona v. United States*, 567 U.S. 387, 411, 412 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012), the Supreme Court stated that Congress has made clear that no formal agreement or special training needs to be in place for state officers to "communicate with the [Federal

Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." 8 U. S. C. § 1357(g)(10)(A). And Congress has obligated ICE to respond to any request made by state officials for verification of a person's citizenship or immigration status. *See* § 1373(c);

The Court went on to explain that there is nothing to suggest that a state law enforcement official could not communicate with federal immigration officers. "Indeed, it has encouraged the sharing of information about possible immigration violations. *See* 8 U. S. C. § 1357(g) (10)(A)." *Arizona v. United States* 387 U. S. at 412. This Court, citing 8 U.S.C. 1373(c), reaffirmed the principal that immigration agents are required to respond to state officials request for verification of a person's citizenship. *Farm Labor Org. Comm. v. United States Border Patrol*, 162 F.Supp.3d 623, 638. (N. Dist. Ohio 2016). Courts applying these principles have repeatedly affirmed decisions to contact and cooperate with Border Patrol on facts remarkably similar to this case.

In *United States v. Ovando-Garzo,* 752 F.3d 1161, 1164-1165, 2014 U.S. App. LEXIS 10062, *8-9, North Dakota State Trooper Christopher Pulver initiated a traffic stop for excessive speed. During the stop the driver admitted that his driver's license had expired. Trooper Pulver then placed the driver under arrest and placed him in his cruiser. Trooper then returned to the car and began questioning the two occupants who did not possess drivers' licenses. Trooper Pulvar knew he could not allow the occupants to drive away and did not want to leave them on the side of the road in winter weather. As Topper Pulvar questioned the occupants, he became suspicious and ultimately asked them if they were in the country illegally to which the responded they were. Trooper Pulvar then contacted Border Patrol who confirmed that the occupants were in the country illegally and requested Trooper Pulvar to hold the occupants until Border Patrol could

10

arrive, which he did. Ultimately, Ovando-Garcia pled guilty of one count of reentry after removal. He appealed the district court's denial of his motion to suppress arguing that local officials have no authority to arrest aliens on the basis of federal immigration violations. The court, in rejecting this argument, held that:

> no written agreement is required for a state official to cooperate with the Attorney General in identifying, apprehending, and detaining any individual unlawfully present in the United States. See 8 U.S.C. § 1357(g)(10). Here, Trooper Pulver's acts—identifying Ovando-Garzo, communicating with the Border Patrol, and detaining Ovando-Garzo until the Border Patrol agent could take custody—were not unilateral and, thus, did not exceed the scope of his authority. See United States v. Arizona, 132 S.Ct. 2492, 2507, 183 L. Ed. 2d 351 (2012) (discussing 8 U.S.C. § 1357(g)(10)); United States v. Quintana, 623 F.3d 1237, 1242 (8th Cir. 2010) (holding state trooper was authorized to assist federal agent in detaining individual suspected of [**9] being unlawfully present in the United States); cf. Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 466-67 (4th Cir. 2013) (recognizing local police may detain and transport an alien after express direction of federal officials) (citing United States v. Guijon-Ortiz, 660 F.3d 757, 765 (4th Cir. 2011) and United States v. Soriano-Jarquin, 492 F.3d 495, 496-97 (4th Cir. 2007)).

In another case, the Northern District of Ohio held that it was appropriate for a highway patrol officer to contact Border Patrol for translation assistance and that a 30 minute detention while waiting for Border Patrol to arrive was not unreasonable. In *U.S. v. Llanez-Garcia,* 2011 U.S. Dist. Lexis 89165 (N.D. Ohio 2011), a highway patrol officer stopped a vehicle for traveling well below the posted speed limit. None of the four occupants of the vehicle possessed a valid driver's license; nor could they communicate in English. The Court concluded that the stop was justified at its inception and that it was appropriate to contact Border Patrol to assist with translation. The Court also found it significant, just like in this case, that none of the occupants had a valid driver's license so the trooper could not allow them to drive away.

Similarly in *U.S. v. Williamson U.S. Dist.* 2011 Lexis 119704 (N.D. Ohio 2011), a trooper pulled a vehicle over for traveling too closely. The trooper discovered that none of the

occupants could produce a vailed identification and none could speak English. When questioning the occupants, the trooper asked "if they were supposed to be here" to which they responded "no." The court held that the initial stop was justified by probable cause and that the trooper's call to Border Patrol for identification assistance was supported by reasonable suspicion if not probable cause and was therefore not a violation of a clearly established constitutional right.

Much like the courts, Congress has made it clear that state officers are encouraged if not required to cooperate on issues of citizenship status. 8 U.S.C.S. § 1373(a) provides that:

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Given this abundant authority, Officer Beard's belief that he could constitutionally communicate with Border Patrol and follow their instructions to wait for Border Patrol to arrive before issuing a final citation and releasing Plaintiffs was imminently reasonable and amply justified. Officer Beard is therefore entitled to qualified immunity.

### 3. *U. S. v. Urrieta* is inapplicable

Plaintiffs' citation to *United States v. Urrieta* 520 F.3d 569 (6th Cit. 2008) does alter qualified immunity here. *Urrieta* addressed a motion to suppress not 42 U.S.C. § 1983; the issue of qualified immunity was never addressed. *Urrieta* stands for the uncontroversial proposition that an officer cannot extend a detention beyond the time necessary for the original purpose of the stop just to ask questions about immigration status. That principle is inapposite here.

12

Officer Beard asked the Plaintiffs questions about their immigration status before any citation for fishing without a license had or could have been issued and only after new circumstances developed to make Officer Beard suspicious that they may in the country unlawfully.  It is settled beyond dispute that new facts uncovered during the course of a lawful stop can be a basis for extending the initial stop.  Here, the lack of identification, necessitating assistance, and the admission that the Plaintiffs were in the country unlawfully, each independently justified the decision to contact Border Patrol and to wait for their arrival before issuing any citation.   Officer Beard is therefore entitled to qualified immunity.

### 4.    Officer Kaufmann is also entitled to qualified immunity

Plaintiffs' claims regarding Officer Kaufmann are even more attenuated.  Plaintiffs do not even allege that Officer Kaufmann had any role in Officer Beard's initial encounter with Plaintiffs or the decision to contact Border Patrol.  Instead, it is undisputed that Officer Kaufmann merely responded to Officer Beard's request for assistance with a wildlife citation. Officer Kaufmann did not even arrive on the scene until Border Patrol had already been contacted, and his sole involvement in the case was to issue the citation for fishing-without-a-license, the validity of which is not in dispute. Plaintiffs wholly fail to support any constitutional challenge against Officer Kaufmann.

In sum, the overwhelming authority cited above precludes any conclusion that Officers Beard and Kaufmann violated a right that has been clearly established in the Supreme Court or the Sixth Circuit of which a reasonable officer would have been aware.  Officers Beard and Kaufmann are entitled to qualified immunity and Count I of the complaint should be dismissed.

### C.    Plaintiffs had no protected right of privacy in the items retrieved from the vehicle and there was no search of the vehicle

13

In Count II of their Complaint Plaintiffs allege that Officer Beard unconstitutionally seized Aracel's car keys without permission, unlocked her car, and retrieved her purse to obtain Aracel's identification.   Comp. ¶ 137.   This claim too fails under qualified immunity scrutiny, because there was consent, there was no search, no constitutionally protected seizure, and no protected right of privacy.

It is undisputed that after Officer Kaufmann arrived, Officer Beard and Martha went to the car for the expressed purpose of retrieving a bottle for Aracel's fussy infant.[1]   Beard Depo pg. 131, Martha Depo pg. 40.   Prior to reaching the car, Officer Beard specifically asked Martha if he could take the keys to unlock the car, to which Martha responded "yes."   Martha Depo. Pg. 39.   Therefore, Martha voluntarily and with consent surrendered the keys to Officer Beard.

Officer Beard unlocked the car and reached in to retrieve the bottle from the front console where he was told it would be.   As he was reaching in to retrieve the bottle, Officer Beard did a brief safety scan and noticed the purse in plain sight. Beard Affidavit ¶. 22.   Since Aracel had told him earlier her identification was in the purse in the car, Officer Beard also retrieved the purse.   Officer Beard did not look in the glove box, the trunk, under the seats, or in any way conduct a search of the vehicle.   Beard Dec. ¶ 25.   There was expressed consent to unlock the car and there was no search.   The only thing retained by Officer Beard was the identification, an act fully within the Fourth Amendment.

*In United States v. Place*, 462 U.S. 696, 706, 77 L.Ed.2d 110, 103 S.Ct. 2637 (1983), the Court held that "some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a

---

[1] Interestingly, Plaintiffs have not plead that it was unconstitutional for Officer Beard to seize a bottle of milk for Aracel's infant child even though the bottle was retrieved under the same circumstances and at the same time the keys and purse were allegedly seized. The Constitution does not make the distinction that Plaintiffs apparently make.

seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." The bottle was seized for the child's comfort, and the ID was obtained because Aracel earlier told Officer Beard where it was. This was no search for evidence of a crime; therefore no Fourth Amendment issue arises. It was reasonable and standard protocol to ensure officer safety for Officer Beard, as opposed to Martha, to retrieve the items. The car had not been searched, so Officer Beard could not be certain that there were no weapons in the car.

As a matter of law, Officer Beard's detention of the identification was not a seizure. *Id.* Moreover, because the purse was in plain view and was where Aracel had earlier told Officer Beard it would be, and she voluntarily put the keys into Martha's possession, a reasonable officer could conclude his brief reaching into the car to obtain specific items was pursuant to consent. Most importantly, there was no constitutionally protected right of privacy and therefore no Fourth Amendment violation. At a minimum, Plaintiffs cannot demonstrate that Officer Beard was clearly wrong in his actions.

The Fourth Amendment protects only that which one has a reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 351-352, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967). The law is well settled that "[w]hat a person knowingly exposes to the public…is not a subject of Fourth Amendment protection." *Id.* at 351. An object that falls within "the plain view of an officer who has a right to be in the position to have that view are subject to seizure…" *United States v. Ellison*, 462 F.3d 557, 561(6th Cir. 2006) quoting *Harris v. United States* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed. 2d 1067 (1968). The bottle and purse retrieved by Officer Beard were not seized, and even if it could be concluded they were, there could be no expectation of privacy in the objects. Officer Beard was allowed to request Aracel's identification. Aracel told him where to find it, Martha consented to opening the car where the purse was in Officer Beard's

15

plain view. There was no right of privacy. Hence, Plaintiffs cannot establish the threshold element to prove a violation of their Fourth Amendment rights.

Lastly, common sense leads to the conclusion that there was no search, unconstitutional or otherwise. Other than a brief scan of the car for officer safety, Officer Beard only retrieved the items that had been earlier identified by Plaintiffs. Officer Beard's retrieval was reasonable and was minimally intrusive. By placing the items in plain view and identifying them for the officer one cannot conclude that Aracel had any expectation of privacy over the objects. A reasonable officer would believe that he had permission to retrieve the items. Officer Beard's conduct was not so clearly wrong that it exhibits a knowing violation of Aracel's right of privacy.

### D. Officer Beard is entitled to qualified immunity on Plaintiffs' Equal Protection Claim

Plaintiffs' cannot save their claims by packaging them as an alleged equal protection violation. In a nutshell, Plaintiffs contend that even if Officer Beard's decisions survive the Fourth Amendment, they are nonetheless unconstitutional because they were motivated by the Plaintiffs' race. To be sure, "[S]ometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (quoting *Futernick v. Sumpter Township*, 78 F.3d 1051, 1056 (6th Cir. 1996)). But that is not what happened here, and Plaintiffs fail as a matter of law to show otherwise.

Allegations like Plaintiffs' are evaluated under the rubric of "selective enforcement." *Id.* The standard for establishing a selective enforcement claim is a "demanding one." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997). And Plaintiffs cannot satisfy it. State actors

16

benefit from a "strong presumption" that they have properly discharged their duties; only "clear evidence" to the contrary will overcome this presumption. *Id.*  The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from selectively enforcing laws with discriminatory purpose and effect. *Bowman v. City of Olmsted Falls*, 756 Fed. Appx. 526, 529-530 (6th Cit. 2018).  Three things are required for a selective enforcement claim:

> ...an official must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, the official must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Gardenshire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).  Plaintiffs meet none of these.

"To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996).  To be considered similarly situated, an individual must be directly comparable in all material respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).    Under this element "it is an absolute requirement that the plaintiff must make at least a *prima facie* showing that similarly situated persons outside her category were not prosecuted." *Gardenshire* 205 F.3d at 319.

Assuming the facts as pled, Plaintiffs cannot meet this high threshold requirement. Plaintiffs argue that there were white people fishing at the reservoir at the same time they were fishing.  That does not pass muster. Plaintiffs have not pled, and discovery has not disclosed, who the other non-Hispanic people were, whether they were United States citizens or whether they in fact did not possess a valid Ohio fishing license.   To prevail, Plaintiffs must establish

17

that other non-Hispanics were also engaged in unlicensed fishing but were not charged. *Griffin v. City of Heath*, 2006 U.S. Dist. Lexis 23468 (N.D. Ohio 2006).

Defendants are unaware of any case that imposed a duty on law enforcement to investigate every possible individual within their view while on patrol. The law places that burden upon Plaintiffs as a prima facie matter. These Plaintiffs have offered nothing in satisfaction of their burden. As courts have repeatedly held, selective enforcement claims are traditionally disallowed because police resources are limited and not every wrongdoer can be caught. *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-534 (6th Cir. 2002).

Plaintiffs' principal contention centers on the second prong of the selective enforcement test: discriminatory purpose. Plaintiff "has the burden of proving the existence of purposeful discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed. 2d 262 (1987). If Plaintiff can meet its initial prima facie burden, then the burden shifts to the government actor to "articulate a race-neutral reason for [his] actions." *United States v. Avery* 137 F.3d 343 (6th Cir 1997).

The only proffered allegation Plaintiffs make to establish discriminatory purpose is one offhand comment allegedly made by Officer Beard to the effect that he was going to send them back to Mexico. Officer Beard vehemently denies ever making this statement. Beard Dec ¶ 29 But even assuming for purposes of summary judgment that he made the statement (and further assuming it can be deemed a racially motivated derogatory statement), this statement, by itself, is insufficient as a matter of law to establish a claim of selective enforcement. A single statement is insufficient to create a material issue of fact concerning the issue of racial targeting. *See Schroeder v. Maumee Bd. Of Ed.* 296 F.Supp 869 (N.D. Ohio 2003) (a single statement by

18

school personnel "shut your mouth about gay rights" was insufficient to establish animus.); *United States v. Salinas-Calderon*, 728 F.2d 1298 (10th Cir 1984) (asking if suspect had a "green card" not improper.)   The use of a single statement "without harassment or some other conduct that deprives a victim of established rights, does not amount to an equal protection violation." *Valdez v. United States*, 58 F.Supp3d 795, 825 (U.S. Dist. Mich. 2014) quoting *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999).

Officer Beard has offered a race-neutral explanation for why he approached Plaintiffs. Officer Beard approached Plaintiffs not because of their race but because they were closest to the top of the steps and therefore were the first group he saw.  Plaintiffs have offered no evidence to negate this justification.   To the contrary, the record only confirms its truth.   Guadalupe conceded in deposition that his group was closer to the top on the steps than the Caucasian couple.  He testified that the other couple was 80-100 feet away from where he was fishing. Guadalupe Depo. Pg 30. Officer Beard chose to walk 20 feet instead of 100 feet.  Distance was the rational, race neutral, reason Plaintiffs were approached—not racial bias.

While the evidence and reasonable inferences are to be construed in favor of the non-moving party, the non-moving party must do more than simply rely on general denials and the allegations of his complaint.  *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974).  It is insufficient for the party opposing summary judgment to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). *Van Hull v. Marriott Courtyard*, 87 F. Supp. 2d 771 (N.D. Ohio 2000).   Therefore, summary judgment for Defendants' on the equal protection claim is appropriate and warranted.

19

## IV. CONCLUSION

Here, the Defendant Officers tried in good faith to perform their job functions while navigating an unexpected encounter with the complex immigration issues that law enforcement officers at state and local levels are encountering more frequently. The actions of the officers were reasonable, and not so outrageous that another reasonable officer might not have acted similarly. The facts and relevant case law do not substantiate that the Officers knowingly violated the Plaintiffs' rights. The Officers enforced a valid natural resources law that they were charged to enforce, and they acted consistent within the scope of their knowledge and experience. Therefore, the Officers are entitled to qualified immunity and judgment in their favor on all counts.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ Scott Myers
SCOTT MYERS (0040686)
DANIEL J. MARTIN (0065249)
Assistant Attorneys General
Environmental Enforcement Section
2045 Morse Road, A-3
Columbus, Ohio 43229-6693
Phone: 614-265-6323
Fax: 614-268-8871
scott.myers@ohioattorneygeneral.gov
daniel.martin@ohioattorneygeneral.gov

*Counsel for Defendants Jason Beard and Nathan Kaufmann*

20

CERTIFICATE OF SERVICE

I hereby certify that the forgoing *Defendants Motion for Summary Judgement* was served by electronic mail to ebrown@ablelaw.com counsel for Plaintiffs and that Notice of Service has been electronically filed with the Court this 24th, day of July 2019. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access the filing through the Court's electronic system.

Scott Myers (0040686)
Assistant Attorney General

21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| Martha Magali Gomez Alvarado, *et al.*, | : | |
| | : | CASE NO: 3:18-cv-00589 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Judge Jack Zouhary |
| Jason Beard, *et al.*, | : | |
| | : | |
| Defendants. | : | |

| | | | |
|---|---|---|---|
| STATE OF OHIO | : | SS: | DECLARATION OF |
| | : | | OFFICER JASON BEARD |
| COUNTY OF ERIE | : | | |

I, Jason Beard, under penalty of perjury, do hereby declare that the following facts are true to the best of my knowledge and belief:

1. I am, and at all relevant times to this action was, a certified peace officer in the State of Ohio serving the Ohio Department of Natural Resources pursuant to Ohio Revised Code Section 1501.24.

2. Now and on October 8, 2017 I served as a Natural Resources Officer. My primary duties were to patrol Ohio parks and waterways.

3. While I have jurisdiction to enforce wildlife laws including fishing violations, wildlife enforcement is outside my primary area of expertise. Accordingly, when presented with a wildlife violation, it is my practice to request the assistance of a Wildlife Officer which is why I requested assistance on October 8, 2017.

4. On October 8, 2017, I was on routine patrol at the Willard Reservoir. Willard Reservoir is a municipally owned facility. The Ohio Department of Natural Resources had law

enforcement jurisdiction on October 8, 2017, pursuant to a Memorandum of Understanding between the City of Willard and the Ohio Department of Natural Resources.

5. Upon arriving at Willard Reservoir, as was my usual practice, I first drove my patrol vehicle up the drive to the boat ramp and did a scan of the reservoir. I saw no boating activity but did see three groups of persons who appeared to be fishing.

6. I proceeded from the boat ramp to the main parking lot located at the south end of the reservoir, parked my vehicle and again as is my usual practice, ascended the steps from the parking area to the top of the earthen dike which formed the reservoir. When I reached the top of the steps, I approached the first group of persons, whom I later discovered to by Plaintiffs, that I encountered. At least one male and one female adult had lines in the water. Another adult female was holding fishing line and searching in a plastic grocery bag and appeared to be supervising several young children that were in the group.

7. I asked them "how the fishing was going" and then asked to see fishing licenses.

8. None of the adults produced fishing licenses and verbally indicated the same. The adult male produced a photo identification titled "Universal Net IDCard"

9. Based upon my training and experience including training received while working with Department of Homeland Security Marine Interdiction Unit, I had a reasonable suspicion that the identification presented to me by Guadalupe Alvarado was fraudulent. The identification was issued by a non-governmental entity, purported to indicate it was issued from another state by having "Florida" displayed across the top, and had expired six months earlier based on the face of the card. No other members of the group had identification on their person.

10. Based upon the totality of the circumstances as presented to that point I asked "are you in the country illegally or legally" to which all members of the group answered "illegally."

2

11. If the three adult Plaintiffs to this action had each presented a valid fishing license or valid government issued identification, I would not have sought the assistance of Border Patrol.

12. At this point I directed the group down the stairs to the parking lot to continue my investigation.

13. As we were descending the steps I made two calls, one to request assistance from a wildlife officer and a second call to the Sandusky Bay Border Patrol Station.

14. My reason for contacting Border Patrol was to request assistance in identifying the adults that I had a reasonable suspicion were fishing without a license.  I was aware, based upon past involvement with Border Patrol, the Border Patrol had finger printing devices and additional data bases that could assist in identification.

15. Border Patrol responded to my initial request with a return phone call.  I was informed that Border Patrol agents were responding and Border Patrol requested that I hold Plaintiffs at the scene until border patrol agents arrived.  They also requested that I ask to ascertain their full names.

16. At some point during the encounter after the party had been moved to a grassy area adjacent to the parking lot, an infant child because fussy.

17. I asked if there was anything I could do to calm the child and I was told there was a bottle in the vehicle the Plaintiffs drove to the reservoir.

18. One of the adult female Plaintiffs asked if she could go to the car to get the bottle and I informed her that it would have to wait until a backup officer arrived because it would have been unsafe for me to leave the group alone.

19. Once Officer Kaufmann arrived it allowed me to go to the vehicle with Ms. Gomez Alvarado to retrieve the child's bottle.

20. As Martha and I approached the car I asked her permission to take the keys and open the car to which she responded "yes" and gave me the keys.

21. Prior to reaching into the car I asked for Martha's if I could retrieve the bottle and she affirmatively consented.

22. As I was reaching into the car to retrieve the bottle I did a brief security scan and saw the purse Aracel had identified earlier. The purse was in plain view.

23. I retrieved the purse because I had been told earlier that Aracel's identification could be found in the purse located in the car.

24. Prior to securing the purse I asked Martha if I could retrieve the purse and she affirmatively consented.

25. While at the car with Martha I only retrieved the bottle and purse. I did not look in the glove box, under seats or any in other way conduct a search of the vehicle.

26. Prior to opening the purse I asked Martha for permission and she consented. I opened the purse and removed only the identification that had been described to me earlier.

27. After retrieving the identification and bottle, I secured a blanket from my patrol vehicle for the group to sit on hoping it would be more comfortable than the grass.

28. I requested the adults to not call anyone on their cell phones because I could not be assured who might show up. I did however, allow the children to play on their phones to distract them from what otherwise might be an uncomfortable situation.

29. At no point did I state "I'm going to send you back to Mexico" or any version of such statement to the Plaintiffs.

30. At this, and any other scene, I have been trained that my primary focus, in addition to law enforcement, is to ensure officer safety.

4

31. Upon Border Patrol's arrival, Border Patrol Agents took control of the scene and I had no further involvement in this matter.

I, Jason Beard, under penalty of perjury, do hereby certify that the above state facts are true to the best of my knowledge and belief.

_____                    _____7/22/19_____

JASON BEARD                                         DATE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Martha Magali Gomez Alvarado, *et al.*, :

    Plaintiffs, :  CASE NO:  3:18-cv-00589

          :

  v.        :

          :  Judge Jack Zouhary

Jason Beard, *et al.*,   :

    Defendants. :


STATE OF OHIO     :  SS: DECLARATION OF
          :     OFFICER NATHAN KAUFMANN
COUNTY OF LUCAS   :

   I, Nathan Kaufmann, under penalty of perjury, do hereby declare that the following facts are true to the best of my knowledge and belief:

1. I am, and at all times relevant to this action was, a certified peace officer in the State of Ohio serving the Ohio Department of Natural Resources pursuant to Ohio Revised Code Section 1501.24.

2. Now and on October 8, 2017, I served as a Wildlife Officer.  My primary duties include enforcement of law relating to the taking of fish and game in Ohio.

3. On October 8, 2017 at approximately 1:20 PM I received a dispatch requesting assistance at the Willard Reservoir concerning a possible fishing violation.

4. I arrived at Willard Reservoir at approximately 1:40 PM.

5. When I arrived I found a large group of children and adults sitting in a grassy area adjacent to the parking lot.  The scene appeared to be calm and under control.

6. I approached Officer Beard who briefed me on the situation and the reason he requested assistance.

7. I conducted a further investigation and discovered fishing tackle and a plastic bag in the trash can near the parking lot. I photographed the tackle and bag. My photographs are attached as Exhibit A-1, A-2 and A-3. [They are also exhibits to his depo so we probably can reference that instead of attaching them here]

8. I determined that two of the adults, Mr. Gomez Alvarado and Ms. Gomez Alvarado could be cited for fishing without a license.

9. Officers are vested with discretion regarding who should be cited, particularly when multiple parties of the same family are in violation, with the principal goal of seeking compliance as opposed to punishment.

10. In the exercise of my discretion, I determined that it was appropriate to cite only Mr. Gomez Alvarado, even thought I determined there was probable cause to cite Ms. Gomez Alvarado.

11. A citation is a warrant to appear before a court in the county where the violation occurred. For this reason a local correct address and establishing a correct identity is critical.

12. Officer Beard informed me that none of the individuals at the scene, including Mr. Gomez Alvarado, could produce a valid, credible form of identification and that Border Patrol was en route to provide additional assistance with identification. To ensure that the information on the citation would be accurate, it was necessary to wait for Border Patrol's arrival to complete the citation. When Border Patrol agents arrived, they determined and instructed me that the information and address included on the Universal Net IDCard could be used to issue the fishing-without-a-license citation. The back of the Net IDCard indicated that it was not to be used official identification purposes.

2

13. By the time I had completed the citation, Mr. Gomez Alvarado had already been loaded into the van so the border patrol agent told me he would take the citation.

14. Under normal situations, it takes approximately 10-15 minutes to draft a citation however that does not include the time required for investigation, collection of information, and other interactions that may be part of a routine stop.

15. Since I issued the citation, I prepared the report which is attached hereto as Exhibit B.

16. Border Patrol Agents instructed me to use the information contained on the Net IDCard to issue the fishing citation.

17. After I gave the citation to the Border Patrol agent I had no further involvement in this action with the exception of answering a call from Kristen Stoker who indicated he was a Deputy Chief Counsel with Homeland Security in Cleveland.


I, Nathan Kaufmann, under penalty of perjury, do hereby certify that the above state facts are true to the best of my knowledge and belief.

_Natth Kanfenn #1287_                                    _7/22/19_

NATHAN KAUFMANN                                          DATE

3



EXHIBIT

A-1

PENGAD 800-631-6989



EXHIBIT

A-2

PENGAD 800-631-6989



EXHIBIT

A-3

PENGAD 800-631-6989

**Ohio Department of Natural Resources**

☐ Summons in lieu of arrest without warrant and complaint on such summons. Rule 4(A)(3)

☐ Summons after arrest without warrant and complaint on such summons. Rule 4(F)

☐ Minor misdemeanor citation Rule 4.1

**750-55371**

_Norwalk_ _____ (County) (Municipal)  Court

_Norwalk_ _____ _Huron_ _____ County, Ohio
(City/Township)　　　　　　　　(Name of County)

THE STATE OF OHIO  ·  CAD Incident # _17AR000259_

_Guadalupe I Lares_
(Name of Defendant)

_560 S Lora St_
(Street Address)

_Lewiston FL 33946_
(City, State, Zip Code)

_(               )_
(Phone Number)

| CASE NO. _____ |
| DOC. _____ PAGE _____ |
| D.O.B _____ AGE ___ |
| SEX ___ WT. ___ HT. ___ |
| HAIR ___ EYES ___ |
| S.S.N. (last 4 digits) [ ][ ][ ][ ] |

Drivers License / State ID# ████████

Employed by _Wells Far..._

## SUMMONS

You are ordered to appear at ____ (a.m.) (p.m.) on ____, ____, ____
(Day) (Month) (Year)

in the _Norwalk_ _____ (County) (Municipal) Court,

located at _45 N Hamett_ _____, _Norwalk_,
(Street)　　　　　　　　(City)

Ohio. If you fail to appear at this time and place a warrant may be issued for your arrest.

This summons served personally on the defendant on ____, 20__

## COMPLAINT

On or about ____ ____, 20__, at ____ (a.m.) (p.m.)

in _New Haven_ _____ City/Township, _Huron_ _____ County, Ohio

you did unlawfully _____
(Describe the Offense Charged)

_Willard Res Waterfowl_ _____

_non-resident Fishing licens_ _____

In violation of Section _1533.32_ ____ and/or ____
(O.R.C.)　　　　　　　　　(Rule)

_____
(Signature of Issuing-Charging Officer)

Being duly sworn the issuing-charging law enforcement officer states that he (she) has read the above complaint and that it is true.

_Nathan Kaufmann #1282_
(Issuing-Charging Officer)

Sworn to and subscribed before me by _____

on ____ ___ 20__

**PEACE OFFICER** authorized

to administer oaths
(Judge/Deputy Clerk)

pursuant to R.C. 2935._____
(County/Municipal) Court

Notary Public

My Commission Expires _____, 20__

_____ County/State of Ohio.

NOTICE TO DEFENDANT: The officer is not required to swear to the complaint upon your copy of the summons and complaint. He (She) swears to the complaint on the copy he (she) files with the court. You may obtain a copy of the sworn complaint before hearing time. You will be given a copy of the sworn complaint before or at the hearing. For information regarding your duty to appear call _____

(Defendant's Signature)

OFFICER'S RECORD

EXHIBIT
B
PENGAD 800-631-6989

P-000028